1
2
3              UNITED STATES DISTRICT COURT
4                   DISTRICT OF NEVADA
5                          * * *
6    COLBERT NICHOLS,                    Case No. 3:13-cv-00671-MMD-WGC
7                           Petitioner,                    ORDER
8         v.
9    ISIDRO BACA,[1] *et al.*,
10                         Respondents.
11
12   **I.    SUMMARY**

13         Petitioner Colbert Nichols, who was found guilty of second-degree murder with the

14   use of a deadly weapon and was sentenced to consecutive terms of 10 to 25 years in

15   prison for the murder conviction and two to five years in prison for the deadly weapon

16   enhancement, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (*See* ECF

17   Nos. 5, 22-1.) This matter is before the Court for adjudication of the merits of Nichols'

18   counseled, third amended petition, which alleges that the state district court violated his

19   right to present a defense by rejecting his proposed jury instructions and right to

20   confrontation by admitting an autopsy report and related testimony. (ECF No. 57

21   ("Petition").) For the reasons discussed below, the Court denies the Petition and a

22   Certificate of Appealability.

23   ///

24   ///

25   ///

26

27         [1]Nichols initiated this habeas proceeding while he was incarcerated. (*See* ECF No.
28   5.) Nichols was released on parole on September 25, 2019. (*See* ECF No. 77 at 6.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.    BACKGROUND[2]

Kevin Emmert testified that he lived in Las Vegas, Nevada with Jeff Becker on September 23, 2007. (ECF No. 62-16 at 33, 41.) That morning, Nichols picked up Emmert and Becker in his suburban and hired them as day laborers to repave a church parking lot. (*Id.* at 34; ECF No. 63-1 at 29.) After working for a few hours, the three men drove to Lake Mead so that Emmert and Becker could assist Nichols with his sailboat and then enjoy some time boating and drinking alcohol. (ECF No. 62-16 at 34–35.) Following the excursion at Lake Mead, the three men drove to the Backstop Sports Pub in Boulder City, Nevada to watch a football game, drink alcohol, and eat. (*Id.* at 35.)

While at the pub, Emmert testified that Nichols reserved a hotel room nearby at the Railroad Pass Casino for himself, Emmert, and Becker so that they could continue working on the church parking lot, which was near the pub and casino, the following day. (ECF No. 62-16 at 36.) After Nichols and another patron at the pub got into a verbal altercation, Nichols was asked to leave. (*Id.* at 3–5, 37.) Becker, who grabbed Nichols' keys, and Emmert followed Nichols out of the pub. (*Id.* at 37.) Becker was initially going to drive the suburban to the Railroad Pass Casino with Emmert in the front passenger seat and Nichols in the back passenger seat. (*Id.*) However, Nichols insisted on driving, and Nichols and Becker traded seats after Becker could not find the correct key on Nichols' keyring. (*Id.*)

According to Emmert, Becker was upset that Nichols insisted on driving because Becker did not like being told what to do. (ECF No. 62-16 at 37) About halfway to the hotel, Nichols talked about paying Becker and Emmert for the next few days of work, and somehow the conversation turned to the fact that Nichols' children were the beneficiaries of his life insurance policies. (*Id.*) Becker commented "something like what if you don't

---

[2]The Court makes no credibility findings or other factual findings regarding the truth or falsity of this summary of the evidence from the state court. The Court's summary is merely a backdrop to its consideration of the issues presented in the case. Any absence of mention of a specific piece of evidence does not signify the Court overlooked it in considering Nichols' claims.

have no kids to give them to." (*Id.*) Nichols "was insulted or took [Becker's question as a threat], pulled the vehicle over in the emergency part of the freeway and asked [Becker] to go home, get out the vehicle and go home." (*Id.* at 38.) Becker refused, and Nichols started driving again after Emmert attempted to calm everyone down. (*Id.*)

According to Emmert, as they arrived at the Railroad Pass Casino, Becker, "being the bully that he [was], pissed [Nichols] off again." (ECF No. 62-16 at 39.) Nichols pulled the suburban over in the outskirts of the parking lot and told Becker to go home. (*Id.*) Becker refused, and Nichols "pull[ed] out a $20 big and thr[e]w[ ] it at him," which "just pissed [Becker] off even more." (*Id.*) Becker exited the suburban "ready to kick [Nichols'] ass," Nichols grabbed his knife on his dashboard, and "they met at the [driver's] door" ready to fight. (*Id.* at 39–40.) As Becker was coming in to punch Nichols, Nichols sidestepped and stabbed Becker with the knife. (*Id.* at 39.)

Emmert testified that Becker got into the driver's seat of the suburban and drove off with Emmert still in the front passenger seat. (ECF No. 62-16 at 40.) Becker passed out while driving, so Emmert continued driving to a nearby CVS pharmacy where he ran inside to get help for Becker. (*Id.*) Paramedics arrived, but Becker died shortly thereafter from two stab wounds to his chest that perforated his heart and left lung. (*Id.*; *see also* ECF No. 63-1 at 13.)

After Becker and Emmert drove away in Nichols' suburban, Nichols walked to the Railroad Pass Casino where he was approached by a security officer. (ECF No. 62-16 at 8.) Nichols, who had injuries to his mouth and was holding the sheathed knife, told the security officer that he had used the knife in self-defense. (*Id.* at 9, 11, 13.) Nichols told the officer that he exited the suburban, opened the front passenger door, told Emmert to get out of the vehicle, tried to pull Emmert out of the vehicle, and then ran back to the driver's side of the vehicle because Becker had climbed into the driver's seat from the rear passenger seat. (*Id.* at 11.) Nichols said he stabbed Becker after Becker "started to punch at him, to kick at him, and began to drive off with [Nichols'] vehicle." (*Id.*)

///

Later, during his interview with detectives, Nichols explained that when they arrived at the Railroad Pass Casino, Becker punched him in the back of the head. (ECF No. 63-1 at 19.) Becker then ran around to the driver's side of the vehicle, and confronted Nichols "face to face outside the vehicle." (*Id.*) Becker punched Nichols a couple of times, and Nichols stabbed Becker. (*Id.*)

Nichols testified at the trial that Becker was agitated at him "for not letting him drive," telling Nichols he did not "have any business telling [him] what to do" and he "should think twice about that kind of stuff." (ECF No. 63-1 at 32.) Nichols told Becker that he was not afraid of him, saying "[w]hat's the worst thing that can happen. I'm toast, my family gets a check for a million dollars and you end up in jail." (*Id.* at 38.) Becker responded, "what if you don't have any kids to collect that life insurance money, who's going to get it then?" (*Id.* at 33.) Becker indicated he knew where Nichols lived, so Nichols took Becker's comment as a threat against his family. (*Id.* at 33.) Nichols pulled the vehicle over and told Becker to get out. (*Id.*) Emmert told Nichols he was "sure that [Becker] didn't mean like he was going to go up to your house and kill your kids or something like that. And [Becker] said damn straight I meant it." (*Id.*)

After Nichols started driving again, Becker hit Nichols in the back of the head. (ECF No. 63-1 at 33.) Nichols pulled over again and told Becker to get out of the vehicle "or [he] was going to have him arrested." (*Id.* at 33.) Emmert told him that he could not just leave Becker in the middle of nowhere, so Nichols gave Becker $20. (*Id.*) Becker then "got out in front of the truck right middle next to the bumper, and from there he just bolted at [Nichols], and he screamed at [him]" that he was "going to kick [Nichols'] white trash ass." (*Id.*) Nichols "was sitting in the truck at that point" thinking that Becker "was going to put the hurt on [him]." (*Id.*) Nichols grabbed his knife "to provide a deterrent to [Becker]," thinking that "if he saw [him] with the knife, he would have the common sense not to continue." (*Id.* at 34.) Becker opened the driver's door, pinned Nichols against the vehicle, and they "grappl[ed] for the knife." (*Id.* at 34, 43.) Nichols stabbed Becker, Becker

4

punched Nichols twice in the mouth, and as Nichols was going down, he stabbed Becker again. (*Id.* at 34.)

The jury found Nichols guilty of second-degree murder with the use of a deadly weapon. (ECF No. 63-8.) Nichols' challenge to his conviction was denied on direct appeal. (ECF No. 22-9.)

## III.     LEGAL STANDARD

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than

incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" ) (internal quotation marks and citations omitted).

**IV.     DISCUSSION**

**A. Ground 1**

In ground 1, Nichols alleges that the state district court violated his Sixth Amendment rights by rejecting his theory of defense jury instructions. (ECF No. 57 at 7.) Specifically, the state district court refused to provide two modified instructions proposed by Nichols: a heat-of-passion instruction and a self-defense instruction. (ECF No. 77 at 17.)

**1.     Heat-of-passion instruction**

Jury Instruction No. 15 instructed the jury as follows:

> The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of a [sic] ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused, unless the circumstances in which he was placed and the facts that confronted him were such as also would have aroused the passion of the ordinarily reasonable man, if likewise situated.

> The State has the burden to prove beyond a reasonable doubt that the defendant did not act in the heat of passion with the requisite legal provocation.

(ECF No. 63-6 at 16.)

Nichols requested the following in lieu of Jury Instruction No. 15:

> The heat of passion which will reduce an *unlawful* homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused, unless the circumstances in which he was placed and the facts that confronted him were such as also would have aroused the passions of the ordinarily reasonable man, if likewise situated.
>
> *If you find beyond a reasonable doubt that the defendant committed an unlawful killing*, the State has the burden to prove beyond a reasonable doubt that the defendant did not act in the heat of passion with the requisite legal provocation.

(ECF No. 63-5 at 3 (emphases added to show addition of requested language).)

### 2.     Self-defense instruction

Jury Instruction No. 23 instructed the jury as follows:

> The right of self-defense is not available to an original aggressor, that is a person who has sought a quarrel with the design to force a deadly issue and thus through his fraud, contrivance or fault, to create a real or apparent necessity for making a felonious assault.
>
> However, where a person without voluntarily seeking, provoking, inviting, or willingly engaging in a difficulty of his own free will, is attacked by an assailant, he has the right to stand his ground and need not retreat when faced with the threat of deadly force or great bodily injury.

(ECF No. 63-6 at 24.)

Nichols requested that the following in lieu of Jury Instruction No. 23:

> The right of self-defense is not available to an original aggressor, that is a person who has sought a quarrel with the design to force a deadly issue and thus through his fraud, contrivance, or fault, to create a real or apparent necessity for making a felonious assault.

*Unless he is the original aggressor, a person who reasonably believes that he is about to be killed or seriously injured by his assailant does not have a duty to retreat, even if he could retreat in complete safety.*

(ECF No. 63-5 at 4 (emphasis added to show change in requested language).)

### 3.      Background information

The following colloquy occurred regarding Nichols' two proposed instructions:

THE COURT: And do you have any other ones that you wish to propose?

[Nichols' counsel]: Yes, your Honor. As to instruction number 15, I would - -

. . .

THE COURT: . . . 15 is the if you find beyond a reasonable doubt, and we have the unlawful homicide. Do you want the unlawful version or the lawful version. [sic]

[Nichols' counsel]: I want the unlawful version.

THE COURT: I got it. I gave it to Sandy.

[Nichols' counsel]: Okay.

[Prosecutor]: Well, I'm objecting to that version, then.

THE COURT: But I'm not giving that. He's making it a court exhibit. He's arguing he wants it. I gave the one that didn't have the unlawful language.

[Nichols' counsel]: And also, it's my understanding that you are striking line nine - -

THE COURT: And picking up with - -

[Nichols' counsel]: - - of that last paragraph.

THE COURT: Right. I'm taking out if you find beyond a reasonable doubt and just starting with the State has the burden. So go ahead and put your - - put what you want on the record.

[Nichols' counsel]: Your Honor, for the record, I think that that is just a very clear statement of the law on manslaughter that the jury has to find beyond a reasonable doubt that the defendant committed an unlawful killing and then it goes into the burden related to the heat of passion, I think. If they

found that it is a lawful homicide, then there's no evaluation whether heat of passion is involved or not.

THE COURT: Okay, [prosecutor].

[Prosecutor]: And Judge, I think that the instruction that the defense is entitled to under the Crawford (phonetic) case that [Nichols' counsel] proposed is basically an instruction that informs the jury that the burden is upon the State in proving the heat of passions and the manslaughter issue. And so I think that as it's written in the instructions that we've proposed, it suffices and say that, and we don't need to stress anymore because there are plenty of other instructions that talk about the burden of proof and what the jury has to find and so I think that that complies with the Crawford decision and it says it in a way that's not confusing. The instruction that [Nichols' counsel] proposed, in my mind, sounded duplicatus [sic] and confusing.

THE COURT: Okay. Then the other one that you wish to propose, [Nichols' counsel], was the one involving instruction number 23.

[Nichols' counsel]: Correct, your Honor.

THE COURT: And that's the retreat and complete safety, and I have that, and I'll give that to Sandy. And go ahead and make your position on that.

[Nichols' counsel]: Your Honor, I will start by just referencing again the Crawford decision, and in that the Supreme Court indicates as follows: And it's talking about a jury instruction - - actually the language that we dealt with in number 15, but the principle applies to 23.

THE COURT: Okay.

[Nichols' counsel]: And the court says that although this instruction was technically correct it had been given, the jurors were not expressly instructed that, and then it goes into some more details. And it says that - - it goes onto [sic] say even though the - - this principle of law could be inferred from the general instructions, this court has held that the district court may not refuse a proposed instruction on the ground that the legal principle it provides may be inferred from other instructions. Jurors should neither be expected to be legal experts nor make legal references with respect to the meaning of the law. Rather, they should be provided with applicable legal principles by accurate, clear and complete instructions specifically tailored to the facts and circumstances of the case. So now jumping to the case that deals with the duty to retreat, which is the Colverson (phonetic) case.

9

That case in the conclusion under the holding of the main opinion states: We further hold that a person who as a reasonable person that he is about to be killed or seriously injured by his assailant does not have a duty to retreat unless he is the original aggressor. The district court errored [sic] when it instructed the jury that the appellant had a duty to retreat if he could have safely withdrawn from the encounter. That's why it was overturned because the court in that case had specifically said that there was a duty. This case clearly says there is no duty, an[d] we are asking that that principle be clearly articulated in this instruction by us adding the phrase even if he could retreat in complete safety corresponds exactly with the state of the law and it does not allow the jury to infer that because the State didn't say that he had a duty to retreat. Well, then there must not be a duty to retreat which is what the State is arguing that they're not introducing an instruction that says that he had the duty, so it's out there and the jury has to infer and they are not legal experts. They don't know the Colverson [case], and then we talked about in the concurring decision because it specifically addresses this issue. Justice Rose (phonetic) wanted to change it to as follows: I would require a nonaggressor [sic] to retreat if he or she could do so in complete safety. This differs somewhat from the majority's position that a nonaggressor [sic] does not have to retreat even though he or she could do so with complete safety. So, your Honor, the state of the law is there's no duty to retreat even if you could do so in complete safety. That is not covered in any of these jury instructions, and it is way too complicated or obtuse for these jurors to be expected to infer that.

THE COURT: Okay.

[Nichols' counsel]: So with that said, that phrase should be included.

THE COURT: And then we also included at your request not only danger of being killed, but also being serious bodily injury.

[Nichols' counsel]: Correct.

THE COURT: We added that at your request.

[Nichols' counsel]: Yes.

THE COURT: [Prosecutor], respond, please.

[Prosecutor]: Yes, Judge. I think that the instructions as provided by the Court say that there's no duty to retreat. And I think that certainly [Nichols' counsel] is free to argue whatever he wants to argue on that principle, and as I see the - - as I read the Colverson case which we should cite is 106 Nevada 484. It's a 1990 case. In that case it sounds like the district court instructed the jury that that defendant did have a duty to retreat if he could have done so safely. We're not giving such an instruction. We are instructing this jury on the fact that the defendant had absolutely no duty

to retreat under any circumstance. And so certainly, I think that the instruction as stated complies with the state of the law, and I wanted to just put the cite to Crawford on the record as well because we talked about a Crawford case.

THE COURT: And we talked about Runion (phonetic) too. We took a lot of these instructions out of Runion.

[Prosecutor]: I don't know if I have - - oh, Crawford is 121 Nevada Advance 74. It's a 2005 case. And Runion - -

(Off the record colloquy.)

THE COURT: I know the Supreme Court knows where to find Runion. I'm not worried. Okay. Other than those, is there anything else you want to propose?

[Nichols' counsel]: No, your Honor, but if she said something very telling. She said that the instructions were [sic] providing say that there's no duty to retreat under any circumstances. If they want to add that phrase, we can add that phrase, but that is not what the instruction say. They don't say under any circumstances. And - -

[Prosecutor]: Judge, I'm paraphrasing. The way it's written, it says there's no duty to retreat. That means there's no duty to retreat, period. It's very clear what that means. And certainly, [Nichols' counsel] can argue that it means there's [no] duty to retreat no matter what the circumstance because that's what that means in and of itself.

[Nichols' counsel]: Again, the principle is that the jurors are supposed to be given the law as clear as we can, and by indicating that there is no duty to retreat even if he could retreat in complete safety, that's the state of the law and it should be clear to them.

. . . .

[Nichols' counsel]: Your Honor, have you made a ruling on the instruction 23 yet.

THE COURT: Yes. I have. I'm not adding the safety issue. The safety - - the - - I'm not adding the language that you're requiring.

[Nichols' counsel]: And just for the record, if we have to appeal this, what's the basis of that?

THE COURT: The basis is as I read the case of the specific language in the case that was overturned, it is not necessary to put that in here.

(ECF No. 63-3 at 13-15.)

### 4.    Standard for review of a denial of a defense instruction

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). "[T]he Constitution [also] guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).

The gist of Nichols' argument is that the state district court prevented him from establishing his defense theory by denying his proposed instructions. *See Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."); *see also Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004) ("Failure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable."); *Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002) ("[T]he state court's failure to correctly instruct the jury on the defense may deprive the defendant of his due process right to a present a defense.").

To be entitled to federal habeas relief, Nichols must demonstrate that the state district court's decision to omit his proposed jury instructions "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993); *see also Byrd v. Lewis*, 566 F.3d 855, 860 (9th Cir. 2009) (explaining that "to obtain relief, [Petitioner] must show that the alleged instructional error had substantial and injurious effect or influence in determining the jury's verdict" (internal quotation marks omitted).)

### 5.    State court determination

In affirming Nichols' judgment of conviction, the Nevada Supreme Court held:

> Nichols argues that the district court erred in refusing to give his proposed heat-of-passion instruction and a modified self-defense instruction. Although Nichols' proposed instructions were correct statements of law, we conclude that the principles of law described in

Nichols' proposed instructions were "fully, accurately, and expressly stated in the other instructions." *Crawford v. State*, 121 Nev. 744, 754, 121 P.3d 582, 589 (2005). Therefore, we conclude that the district court did not abuse its discretion in denying the requested instructions. *See id.* at 748, 121 P.3d at 585.

(ECF No. 22-9 at 5–6.)

### 6.    Conclusion

#### a.  Heat-of-passion instruction

As discussed, Nichols requested the following in lieu of Jury Instruction No. 15:

> The heat of passion which will reduce an *unlawful* homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused, unless the circumstances in which he was placed and the facts that confronted him were such as also would have aroused the passions of the ordinarily reasonable man, if likewise situated.
>
> *If you find beyond a reasonable doubt that the defendant committed an unlawful killing*, the State has the burden to prove beyond a reasonable doubt that the defendant did not act in the heat of passion with the requisite legal provocation.

(ECF No. 63-5 at 3 (emphases added to show addition of requested language).)

Nichols argues that the "unlawful" qualifier in the first sentence of the first paragraph of his proposed instruction was necessary because only an unlawful killing— as compared to a legally excusable or justifiable killing—can amount to manslaughter. (ECF No. 77 at 22.) As such, Nichols contends that Jury Instruction No. 15 as given ambiguously indicated that he could be convicted of manslaughter even if the jury found that he acted in self-defense. (*Id.*)

As the Nevada Supreme Court, the final arbiter of Nevada law, concluded, Nichols' "unlawful" qualifier was a correct statement of Nevada law. *See* NRS § 200.040(1) ("Manslaughter is the *unlawful* killing of a human being, without malice express or implied, and without any mixture of deliberation" (emphasis added).). However, Jury Instruction No. 14 informed the jury that "[v]oluntary [m]anslaughter is the *unlawful* killing of a human being." (ECF No. 63-6 at 15 (emphasis added).) Moreover,

the jury was instructed that "[t]he killing of another person in self-defense is justified and not unlawful." (ECF No. 63-6 at 20.) Accordingly, as the Nevada Supreme Court reasonably determined, the jury was accurately instructed through other instructions that voluntary manslaughter was an unlawful killing such that it could not find Nichols guilty of manslaughter if it found he acted in self-defense. *See Estelle v. McGuire,* 502 U.S. 62, 72 (1991) (explaining that when reviewing jury instructions, this court considers that jury instruction "in the context of the instructions as a whole and the trial record"); *see also Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995) ("Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury.").

Regarding the clause added to the beginning of the second paragraph of his proposed instruction, Nichols argues that it clarified that the jury was only to consider whether he committed voluntary manslaughter if it first found that he did not act in self-defense. (ECF No. 77 at 23 (citing *Hill v. State*, 647 P.2d 370, 371 (Nev. 1982) ("Without doubt, the burden of proving absence of justification or excuse for the homicide resides with the state.")).) However, the jury was instructed in Jury Instruction No. 4 that it "must decide if [Nichols was] guilty of any offense and, if so, of which offense," including "murder of the first degree, murder of the second degree and voluntary manslaughter." (ECF No. 63-6 at 5.) Thus, as the Nevada Supreme Court reasonably determined, the jury was accurately instructed through other instructions that it was to first consider whether Nichols acted in self-defense before moving on to considering the offenses. *See Estelle,* 502 U.S. at 72; *Duckett*, 67 F.3d at 745.

#### b. Self-defense instruction

As discussed, Nichols requested the following instruction in lieu of Jury Instruction No. 23:

> The right of self-defense is not available to an original aggressor, that is a person who has sought a quarrel with the design to force a deadly issue and thus through his fraud, contrivance, or fault, to create a real or apparent necessity for making a felonious assault.

14

*Unless he is the original aggressor, a person who reasonably believes that he is about to be killed or seriously injured by his assailant does not have a duty to retreat, even if he could retreat in complete safety.*

(ECF No. 63-5 at 4 (emphasis added to show change in requested language).) The second paragraph of Jury Instruction No. 23 provided that "where a person without voluntarily seeking, provoking, inviting, or willingly engaging in a difficulty of his own free will, is attacked by an assailant, he has the right to stand his ground and need not retreat when faced with the threat of deadly force or great bodily injury."[3] (ECF No. 63-6 at 24.)

Nichols' proposed jury instruction, as compared to Jury Instruction No. 23, thus added the statement that retreating was not required "even if he could have done so in complete safety." (ECF No. 77 at 24.) Although Nichols' proposed instruction may have been an accurate statement of Nevada law, as the Nevada Supreme Court reasonably determined,[4] Jury Instruction No. 23, as given, was also a correct statement of Nevada law and complied with the Nevada Supreme Court's sample self-defense jury instruction

---

[3] Nichols cites to his direct appeal opening brief for the language contained in Jury Instruction No. 23. (*See* ECF No. 57 at 9 (citing ECF No. 22-2 at 15); *see also* ECF No. 77 at 26.) However, his direct appeal opening brief quoted the second paragraph of Jury Instruction No. 23 incorrectly. (*Compare* ECF No. 22-2 at 15 (Nichols' direct appeal opening brief quoting the second paragraph in Jury Instruction No. 23 as follows: "A person who reasonably believes that he is about to be killed or seriously injured by his assailant does not have a duty to retreat unless he is the original aggressor") *with* ECF No. 63-6 at 24 (showing that the second paragraph of Jury Instruction No. 23 as provided to the jury read as follows: "However, where a person without voluntarily seeking, provoking, inviting, or willingly engaging in a difficulty of his own free will, is attacked by an assailant, he has the right to stand his ground and need not retreat when faced with the threat of deadly force or great bodily injury.").)

[4] *See State v. Grimmett*, 112 P. 273, 273 (Nev. 1910) (establishing that a person "need not flee for safety, but has the right to stand his ground and slay his adversary"); *Culverson v. State*, 797 P.2d 238, 240-41 (Nev. 1990) (holding that "a person, who is not the original aggressor, has no duty to retreat before using deadly force, if a reasonable person in the position of the non-aggressor would believe that his assailant is about to kill him or cause him serious bodily harm"). Notably, the language "complete safety" appears only in dicta. *See Culverson*, 797 P.2d at 240 (explaining that "it is often quite difficult for a jury to determine whether a person should reasonably believe that he may retreat from a violent attack in complete safety").

1  regarding retreat.[5] *See Runion v. State*, 13 P.3d 52, 59 (Nev. 2000) (providing "sample

2  instructions for consideration by the district courts in future case where a criminal

3  defendant asserts self-defense"). Therefore, as the Nevada Supreme Court also

4  reasonably determined, the jury was accurately instructed on Nichols' theory of defense

5  that he was not required to retreat.

6       Because the Nevada Supreme Court's determination regarding Nichols'

7  proposed jury instructions on his theory of defense was neither contrary to nor an

8  objectively unreasonable application of clearly established federal law or based on an

9  unreasonable determination of the facts, Nichols is not entitled to federal habeas relief

10  for ground 1.

11       **B.  Ground 2**

12       In ground 2, Nichols alleges that the state district court violated his Sixth

13  Amendment right to confrontation by admitting the testimony of a medical examiner and

14  the autopsy report without the testimony of the doctor who prepared that report. (ECF

15  No. 57 at 11.)

16       **1.       Background information**

17       The State attempted to admit Becker's autopsy report through Dr. Jacqueline

18  Benjamin, a Clark County medical examiner. (ECF No. 63-1 at 11-12.) Dr. Benjamin did

19  not perform the autopsy or prepare the report; rather, the autopsy and corresponding

20  report were done by Dr. Peter Cupaczech. (*Id.* at 12.) Dr. Benjamin explained that Clark

21  County medical examiners "will testify for each other if someone is out, either out of state,

22  they're on vacation or they have other responsibilities." (*Id.*)

23  ///

24

25       [5]Not only did Jury Instruction No. 23 mirror the Nevada Supreme Court's sample

26  self-defense jury instruction regarding retreat, but it also added "or great bodily injury" to
the end of the second paragraph at Nichols' counsel's request. *Compare* ECF No. 63-6

27  at 24 (". . . he has the right to stand his ground and need not retreat when faced with the
threat of deadly force or great bodily injury") *with Runion*, 13 P.3d at 59 (" . . . he has the

28  right to stand his ground and need not retreat when faced with the threat of deadly force.").
This additional language benefitted Nichols.

1    Nichols' counsel objected to the admission of the autopsy report through Dr.

2    Benjamin, explaining "she wasn't there for the autopsy, she didn't do the autopsy, my

3    client is entitled to full and effective cross-examination opportunities for State's

4    witnesses." (ECF No. 63-1 at 12.) Nichols' counsel elaborated: "I will not be able to cross-

5    examine her on any details of this autopsy because she didn't do it, she wasn't there, and

6    all that she can talk to are the printed words on that paper of the doctor who actually did

7    it." (*Id.*) The state district court overruled the objection. (*Id.* at 13.)

### 2.    Standard for Confrontation Clause violation

9    The Sixth Amendment's Confrontation Clause provides: "In all criminal

10  prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

11  against him." "[A] primary interest secured by [the Confrontation Clause] is the right of

12  cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418 (1965); *see also Kentucky*

13  *v. Stincer*, 482 U.S. 730, 739 (1987) ("[T]he Confrontation Clause's functional purpose

14  i[s] ensuring a defendant an opportunity for cross-examination."). The Confrontation

15  Clause bars "admission of testimonial statements of a witness who did not appear at

16  trial unless he was unavailable to testify, and the defendant had had a prior opportunity

17  for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). If a

18  Confrontation Clause violation occurs, federal habeas relief is proper only if the violation

19  "had substantial and injurious effect or influence in determining the jury's verdict."

20  *Brecht*, 507 U.S. at 637-38; *see also Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir.

21  2002) ("A Confrontation Clause violation is subject to harmless error analysis.").

### 3.    State court determination

23  In affirming Nichols' judgment of conviction, the Nevada Supreme Court held:

24        Nichols argues that the district court erred in admitting the medical
examiner's report through the testimony of a witness who was not present

25  at the autopsy in violation of the Confrontation Clause because the medical

26  examiner who performed the autopsy was not available to be cross-
examined. *See Melendez-Diaz v. Massachusetts*, __ U.S. __, 129 S.Ct.

27  2527 (2009); *Crawford v. Washington*, 541 U.S. 36 (2004); *Medina v. State*,
122 Nev. 346, 143 P.3d 471 (2006). He further contends that the district

28

court erred in admitting the testimony of a medical examiner who did not perform the autopsy.

We conclude that the district court did not abuse its discretion in admitting Dr. Benjamin's expert testimony. Dr. Benjamin testified as an expert witness to matters "within the scope of [her specialized] knowledge," NRS 50.275, based on facts or data "made known to [her] at or before the hearing," NRS 50.285(1), that are "of a type reasonably relied upon by experts in forming opinions or inferences" and therefore "need not be admissible in evidence," NRS 50.285(2). Even assuming that the autopsy report was testimonial hearsay and therefore the admission of the report or testimony regarding facts contained in the report violated Nichols' confrontation rights,

> [FN1] We note that other courts are split on the issue of whether autopsy reports are testimonial under *Crawford v. Washington*, 541 U.S. 36 (2004). *Compare U.S. v. De La Cruz*, 514 F.3d 121, 133 (1st Cir. 2008) (concluding that autopsy reports fall within business records hearsay exception and that "business records are expressly excluded from the reach of *Crawford*"), *cert. denied*, __ U.S. __, 129 S.Ct. 2858 (2009), *and U.S. v. Feliz*, 467 F.3d 227, 233-37 (2d Cir. 2006) (similar), *with People v. Dungo*, 98 Cal. Rptr. 3d 702, 704-05 (Ct. App. 2009) (concluding that under *Melendez-Dias*, an autopsy report is testimonial), *review granted and opinion superseded* (December 2, 2009), *People v. Lonsby*, 707 N.W.2d 610, 619-21 (Mich. Ct. App. 2005) (concluding that notes and report prepared by nontestifying crime lab serologist's testimony violated defendant's confrontation rights), *State v. Johnson*, 756 N.W.2d 883, 889-92 (Minn. Ct. App. 2008) (similar but as to autopsy report), *People v. Rawlins*, 884 N.E.2d 1019, 1033-35 (N.Y. 2008) (similar but as to fingerprint reports), *cert. denied subnom. Meekins v. New York*, __ U.S. __, 129 S.Ct. 2856 (2009), *and State v. Locklear*, 681 S.E.2d 293, 304-05 (N.C. 2009) (similar but as to pathologist report). We decline to reach the issue as doing so is unnecessary to a resolution of this appeal.

we conclude that the error was harmless. The facts concerning the matter in which the victim died were uncontested, and there was ample evidence in the form of testimony and autopsy photographs that the victim died as a result of the stab wounds.

(ECF No. 22-9 at 4-5.)[6]

---

[6]Nichols argues that the Nevada Supreme Court did not adjudicate his constitutional claim on its merits, so this court should review this ground *de novo*. (ECF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.     Conclusion

In June 2009, between Nichols' trial and the Nevada Supreme Court's affirmation of his judgment of conviction on direct appeal, the Supreme Court of the United States held that "analysts' affidavits [are] testimonial statements," so "[a]bsent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to be confronted with the analysts at trial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009) (emphasis in original) (internal quotation marks omitted). However, the testimonial nature of an autopsy was not evaluated by the United States Supreme Court. As such, at the time Nichols' direct appeal was decided,[7] the Nevada Supreme Court's ultimate denial of relief on Nichols'

---

No. 77 at 32-33.) Although the Nevada Supreme Court did not decide whether Nichols' Confrontation Clause rights were violated, it did not decline to analyze the violation as Nichols contends. Rather, the Nevada Supreme Court performed a thorough evaluation of the "split on the issue of whether autopsy reports are testimonial." (ECF No. 22-9 at 5 n.1.) Under AEDPA, an adjudication on the merits is "a decision finally resolving the parties' claims . . . that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004) (alteration in original). The Nevada Supreme Court resolved Nichols' Confrontation Clause claim on the substance of the claim by assuming that the autopsy report was testimonial and then conducting a harmless error analysis. Thus, because the Nevada Supreme Court adjudicated this claim, the Court reviews ground 2 under AEDPA's deferential standard of review.

Nichols also argues that the Nevada Supreme Court made an unreasonable determination of the facts when it found that Dr. Benjamin testified as an expert because she was not testifying as an expert with respect to the testimonial parts of the autopsy report. (ECF No. 77 at 41.) The Court disagrees. Dr. Benjamin testified to more than just the autopsy report, and that testimony was based on her medical examiner expertise. For example, Dr. Benjamin testified about what body tissues the knife would have gone through in perforating Becker's heart and lung, the force required for the knife to have perforated Becker's heart, the definition of homicide "from an examiner's standpoint," and the metabolizing of alcohol by the liver. (ECF No. 63-1 at 13-15.)

[7]The United States Supreme Court had not decided *Bullcoming v. New Mexico* or *Williams v. Illinois* at the time of Nichols' direct appeal. *See Bullcoming v. New Mexico*, 564 U.S. 647, 652 (2011) (holding that "the Confrontation Clause [does not] permit[ ] the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification . . . unless the analyst is unavailable at trial, and the accused

Confrontation Clause claim regarding the autopsy report and Dr. Benjamin's testimony about that report was not contrary to, or an unreasonable application of, clearly established law as determined by the Supreme Court of the United States.

Further, the harmless-error standard applied by the Nevada Supreme Court appears to be the harmless-error standard for federal constitutional violations articulated in *Chapman v. California*, 386 U.S. 18 (1967). The applicable test for whether a federal constitutional error was harmless varies with the procedural posture of the case. *Davis v. Ayala*, 576 U.S. 257, 267 (2015). On a direct appeal, the standard from *Chapman* governs. Under *Chapman*, the burden is on the prosecution to prove beyond a reasonable doubt that the error did not contribute to the verdict, such that the reviewing court must be able to declare a belief that the error was harmless beyond a reasonable doubt. 386 U.S. at 24. Under *Chapman*, an error is not harmless if there is a reasonable possibility that the error might have contributed to the conviction. *See id.* In contrast, on collateral review, such as in the present petition, the standard from *Brecht v. Abrahamson*, 507 U.S. 619, (1993), instead controls.

Under *Brecht*, the record must demonstrate that the error resulted in actual prejudice. *See, e.g.*, *Ayala*, 576 U.S. at 267. Federal habeas relief is appropriate under this standard only if the court has grave doubt whether the trial error had a substantial and injurious effect or influence in determining the jury's verdict. *See id.* at 267-68. *Brecht* requires more than *Chapman*'s reasonable possibility that the error might have contributed to the conviction, and the court instead must find that the defendant sustained actual prejudice from the error. *See id.* at 268. Under AEDPA, a federal court may not overturn a state court harmless-error determination unless the state court applied the *Chapman* standard in an objectively unreasonable manner. However, application of the *Brecht* standard subsumes the inquiry of whether the state court's

---

had an opportunity, pretrial, to cross-examine the particular scientist"); *Williams v. Illinois*, 567 U.S. 50 (2012) (holding that the admission of a test that was not prepared to furnish evidence against a specific individual did not implicate the Confrontation Clause). Notably, *Bullcoming* and *Williams* did not specifically address autopsy reports.

application of the *Chapman* standard was objectively unreasonable. *See Ayala*, 567 U.S. at 268. That is, if the record demonstrates that the error was not harmless under *Brecht*, the petitioner will have established that the state court's application of *Chapman* was objectively unreasonable under AEDPA's deferential standard of review. *See, e.g.*, *Fry v. Pliler*, 551 U.S. 112, 119-20 (2007); *Hall v. Haws*, 861 F.3d 977, 992 (9th Cir. 2017).

Here, the Nevada Supreme Court reasonably concluded that the record fails to demonstrate that Nichols sustained actual prejudice from the alleged error. The autopsy report and Dr. Benjamin's testimony discussed the manner of Becker's death—homicide—and the cause of his death—the stab wounds to the chest. (*See* ECF Nos. 63-1 at 13-14; 22-6 at 14-20.) However, as the Nevada Supreme Court reasonably noted, there was ample evidence that Becker died from the stab wounds, not from some intervening incident.

Nichols admitted to stabbing Becker. (*See* ECF No. 63-1 at 46.) Emmert testified that Becker passed out from his injuries while driving to the hospital, and the paramedics took Becker in an ambulance from the CVS pharmacy. (ECF No. 62-16 at 40.) Lucina Courtney, an employee at the CVS pharmacy, testified that she applied pressure to Becker's wounds as he was sitting in the driver's seat of the Suburban before the paramedics arrived. (ECF No. 62-16 at 28-30.) And Detective Chad Mitchell with the Henderson Police Department testified that he observed Becker's body at the hospital on the night of the stabbing and "was notified by the paramedics that [Becker] had died." (ECF No. 63-1 at 9-10.) Detective Mitchell attended the autopsy and laid the foundation for the autopsy photographs, which showed the stab wounds "underneath the left breast and . . . on the left side of [the] torso," to be admitted at the trial. (*Id.* at 10-11.)

Given these facts, there was not a reasonable probability that the jury would have arrived at a different verdict had the state district court excluded the autopsy report and Dr. Benjamin's testimony. Accordingly, because any error was harmless under the *Brecht* standard, the Nevada Supreme Court's application of the harmless-error

1   standard was neither contrary to nor an objectively unreasonable application of clearly

2   established federal law. Nichols is not entitled to federal habeas relief for ground 2.[8]

3   **V.    CERTIFICATE OF APPEALABILITY**

4       This is a final order adverse to Nichols. Rule 11 of the Rules Governing Section

5   2254 Cases requires this court to issue or deny a certificate of appealability ("COA").

6   Therefore, the Court has *sua sponte* evaluated the claims within the petition for suitability

7   for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851,

8   864–65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when

9   the petitioner "has made a substantial showing of the denial of a constitutional right." With

10  respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable

11  jurists would find the district court's assessment of the constitutional claims debatable or

12  wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S.

13  880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists

14  could debate (1) whether the petition states a valid claim of the denial of a constitutional

15  right and (2) whether the court's procedural ruling was correct. *See id.*

16      Applying these standards, the Court finds that a certificate of appealability is

17  unwarranted.

18  **VI.    CONCLUSION**

19      It is therefore ordered that the petition for a writ of habeas corpus pursuant to 28

20  U.S.C. § 2254 (ECF No. 57) is denied.

21      It is further ordered that a certificate of appealability is denied.

22  ///

23  ///

24

25      [8]Nichols requests that this court "[c]onduct an evidentiary hearing at which proof
    may be offered concerning the allegations in [his] amended petition and any defenses
26  that may be raised by respondents." (ECF No. 57 at 14.) Nichols fails to explain what
    evidence would be presented at an evidentiary hearing. Furthermore, the Court has
27  determined that Nichols is not entitled to relief, and neither further factual development
    nor any evidence that may be proffered at an evidentiary hearing would affect the Court's
28  reasons for denying relief. Nichols' request for an evidentiary hearing is denied.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 1st Day of November 2021.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE